UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/26/2021___
```

ISAIAH BLANCH,

                              Plaintiff,

                v.

MICHAEL A. SCHIFF, SHERIFF OF SULLIVAN
COUNTY JAIL; et al., *individually and in their
official capacities*,

                              Defendants.

18 CV 838 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Isaiah Blanch ("Plaintiff" or "Blanch") brings this action under 42 U.S.C. § 1983 ("Section 1983") against Defendants—Joe D.P.W., D.P.W. Senior Maintenance; Janet Calangelo, Corporal and Grievance Coordinator; and Garrett Gabriel, Corporal and Grievance Coordinator (collectively, the "Conditions Defendants"); Nurse Gandulla, Nurse Altman, Nurse Moore, Dr. Good, Nurse Practitioner Sauer, Nurse Davis, and Nurse Crawley (collectively, the "Medical Defendants"); and Sheriff Schiff, Undersheriff Chaboty, Lieutenant & Chief Administrator/Grievance Coordinator Bini, and Jail Administrator Smith (collectively, the "Supervisory Defendants," and, together with the Conditions and Medical Defendants, "Defendants")—for alleged constitutional violations while he resided at Sullivan County Jail. ("Third Amended Complaint" (ECF No. 70).) Currently before the Court are three separate motions to dismiss.[1] For the following reasons, Defendants' motions are GRANTED.

---

[1] The Court notes that despite the Court's order directing Defendants to file all motion documents for their respective motions on the reply date, including Plaintiff's opposition (ECF No. 75), the Medical Defendants failed to file Plaintiff's opposition papers with their motion. However, since Plaintiff prepared a single opposition to all three motions, which he served on the Court (ECF Nos. 76-79), and which was filed by the Conditions and Supervisory Defendants (ECF Nos. 86, 101), Plaintiff has not been prejudiced by the Medical Defendants' oversight.

# BACKGROUND

The facts herein are drawn from Plaintiff's Third Amended Complaint ("TAC" (ECF No. 70)), Plaintiff's Declaration (ECF Nos. 78, 86, 101) and Affidavit (ECF Nos. 79, 86, 101) in Opposition to Defendants' Motions to Dismiss, which append a statement of facts, referred to as "Exhibit 2" (*id.*) and incorporates by reference 120 pages of exhibits including grievances and call slips referred to as "Exhibit 1" (ECF No. 13).[2] The Court "accepts all well-pleaded facts in the Complaint and Supplemental Pleading as true for the purpose of ruling on a motion to dismiss." *Jackson v. NYS Dep't of Labor*, 709 F.Supp.2d 218, 222 (S.D.N.Y. 2010).

## I.      Plaintiff's Allegations

Plaintiff was arrested and remanded to Sullivan County Jail in on September 6, 2017 for a parole violation. (TAC at 7, 25, 37; *see id.* at 3 (listing Plaintiff's prisoner status as "Convicted and sentenced prisoner").) He was transferred from Sullivan County Jail to another facility in March of 2018. (*Id.* at 7.)

### A.      Conditions of Confinement

Plaintiff alleges that for the entire six-month period that he was housed in the modular unit ("the Unit") at Sullivan County Jail, he suffered from inadequate ventilation and mold, both of which got worse as the weather got colder and the heat in the Unit was turned up. (*Id.* at 27, 42.)

---

[2] Defendants contend that the Court should not consider the 120 pages of exhibits to which Plaintiff refers as "Exhibit 1" because those pages were appended only to the First Amended Complaint and not to the operative Third Amended Complaint. The Court disagrees. Although Plaintiff was warned that his amended complaints would completely replace, not supplement, the prior versions, (ECF No. 67 (noting that "piecemeal pleading" is impermissible (citing *Zito v. Leasecomm Corp.*, No. 02 CIV.8074 GEL, 2004 WL 2211650, at *26 (S.D.N.Y. Sept. 30, 2004))), the Court is required to construe *pro se* submissions liberally, *see Haines v. Kerner,* 404 U.S. 519, 520 (1972) (*pro se* complaints held to less stringent standards than formal pleadings drafted by lawyers), and, further, courts may "consider factual allegations made by a *pro se* party in his papers opposing the motion," *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013). The Third Amended Complaint itself mentions these exhibits, (*e.g.* TAC at 44 "Plaintiff have sent the (PRO SE INTAKE UNIT) with certain sick call slips"). Moreover, Plaintiff has incorporated by reference and cited to these exhibits in his opposition papers (ECF Nos. 78, 79, 81, 86, 101), and indicates in the affidavit of service for his opposition papers that no copies were available at the time he sent his opposition papers (ECF No. 101 at 15). Accordingly, the Court has considered the 120 pages of exhibits referred to as "Exhibit 1" in its review of Defendants' motions.

He further alleges that the water in the Unit—which was used for both drinking and bathing—smelled bad and was "rusty brown," which caused painful skin rashes and boils and, for at least two or three days he was deprived of adequate drinking water.

Plaintiff alleges that as a result of prolonged exposure to these conditions, he suffered numerous conditions daily—including headaches, chest and eye pain; was diagnosed with hypertension and type 2 diabetes for which he had to take medication; had difficulty breathing and sleeping; coughed up blood; and developed painful skin rashes and boils—none of which he suffered prior to residing in the Unit. (*Id.* at 6-7, 11-12, 18, 23.)

Plaintiff alleges that the Supervisory and Conditions Defendants "knew of and ignore[d], and or should have [known] of the inadequate conditions" in the Unit and "systemically, deliberately, and collectively ignored, and[/]or failed to take reasonable measures" and also "participated directly in violating" Plaintiff's constitutional rights. (*Id.* at 16.) Plaintiff further alleges that Defendants Schiff, Chaboty, and Smith knew of the unlawful conditions in the modular unit because they were named in a previous lawsuit regarding the living conditions in the Unit including poor ventilation, mold, and foul water. (*Id.* at 9, 16-17, 20 (citing *Johnson v. Schiff*, No. 17-CV-8000 (KMK), 2019 WL 4688542 (S.D.N.Y. Sept. 26, 2019)). Plaintiff alleges that Corporals Gabriel and Calangelo and Lieutenant Bini knew of the unsanitary conditions because they responded to Plaintiff's grievances regarding the conditions. Plaintiff further alleges both that Corporals Gabriel and Calangelo would have seen and smelled the mold and inadequate ventilation on daily rounds and that they both failed to come to the Unit to investigate the conditions he reported in his grievances. (*Id.* at 21-22.)

### 1.    Ventilation and Mold

When Plaintiff arrived at Sullivan County Jail in September 2017, he was assigned to a cell with three other inmates who shared one bed, one sink, one toilet, and one window that does not

open. (*Id.* at 36.) He and his cellmates, along with inmates from three other cells, shared one shower and between the cells was a common area with two air vents. (*Id.*) From the time he arrived in the Unit, the air vents in Plaintiff's cell and throughout the unit were covered in dust, dirt and rust and the shower had no ventilation at all. (*Id.* at 36-37.) There was mold on the walls, floors, ceilings, and in the showerhead of the shower and since Plaintiff's cell was only about six feet from the shower, he constantly had to breathe in the mold. (*Id.* at 8, 33, 37.)

When Plaintiff arrived in the Unit, he asked for cleaning supplies to clean his cell and the shower but the diluted chemicals and dirty rag he was given were inadequate and it was impossible for him to clean the vent in his cell, which required special tools, and which was blowing particles including cigarette butts and paper into his cell. (*Id.* at 25-26, 376.)

### 2.   Water Quality

Plaintiff further alleges that during his time in the Unit, the water used for drinking, brushing teeth, and showering, was "regularly" rusty and discolored, contained particles, tasted metallic, and had a bad odor. (*Id.* at 8, 19, 41.) On or around December 22, 2017, Plaintiff reported to a deputy that water in the sink in his cell was brown and had a bad odor, at which point an informal grievance was noted. (*Id.* at 29; Blanch Aff. ¶ 7 (stating Plaintiff wrote grievance on or about December 21, 2017); *see* ECF No. 13 at 62 (copy of informal grievance).) Plaintiff alleges that, because the heat in the Unit was very hot in the winter (TAC at 29); and during daily meals he only received a small cup of coffee and juice with breakfast, milk with lunch, and a cup of juice with dinner (*id.* at 29-30); he was forced to drink water from the shower, which limited his drinking and caused him to feel "weak, dizzy, dehydrated," and have headaches (*id.* at1 8, 29-30, 41-42; Blanch Aff. ¶ 8). Plaintiff alleges that for about two or three days he was "forced" to drink water from the shower. (TAC at 12.)

On December 25, 2017 while Plaintiff was showering, the shower nozzle fell off and Plaintiff saw that the nozzle was filled with scum and rust, which he reported to the deputy. (*See* ECF No. 13 at 93 (informal grievance form dated Dec. 25, 2017).) A corporal told Plaintiff that he would make sure that the shower got fixed but that the maintenance workers were out of work for the holiday. (*Id.*; TAC at 30-31.) An informal grievance was signed by Plaintiff, the deputy, and a corporal. (ECF No. 13 at 93.) Plaintiff also asked the corporal to look into the issues with his sink and the mold in the showers. (TAC at 31.) Another corporal denied Plaintiff's request to shower in another unit while the shower for his unit was broken. (*Id.* at 34.)

On or around January 3, 2018, Joe D.P.W. put a different used nozzle on the broken shower but did not address the mold or Plaintiff's sink. (*Id.* at 32; Blanch Aff. ¶ 6.) Plaintiff alleges that Joe D.P.W. must have seen and smelled the issues in the shower, including the mold, when he put the shower nozzle back on. (TAC at 9, 13, 22-24.) Plaintiff further alleges that after the shower nozzle was replaced, he could no longer drink from the shower because it did not produce cold water, (*Id.* at 41), and, further, that once he learned that there was scum in the showerhead, he feared that drinking the shower water posed a serious risk to his health (*Id.* at 32).

B.   *Medical Care*

Within three days of his arrival at Sullivan County Jail, Plaintiff was screened by Nurse Altman, who checked Plaintiff's blood pressure and weight, gave him a tuberculosis test, and asked about allergies and vaccination history. (*Id.* at 38.) When Plaintiff told Nurse Altman that he wears glasses and needed a pair, Nurse Altman responded that Plaintiff would be put on the list but that it takes months to see an eye doctor. (*Id.*) At the time of the initial screening, Plaintiff did not have any symptoms of hypertension or type 2 diabetes. (*Id.* at 38-39.) Plaintiff alleges that it was "medically necessary" for Defendant Altman to perform bloodwork or lab tests to uncover any medical conditions Plaintiff might have. (*Id.* at 47.)

5

In October, Plaintiff told Nurse Altman that his eyes were starting to hurt and that he needed his glasses as soon as possible, to which Nurse Altman responded that Plaintiff needed to have patience. (*Id.* at 39.) Plaintiff did not see the eye doctor until February 2018. (*Id.* at 48.)

In November, Plaintiff began to feel sick—including daily dizziness and headaches and severe eye pain—which he reported on a sick call slip to either Nurse Altman or Moore, who gave him ibuprofen and ignored his request to see a doctor. (*Id.*)

During December, Plaintiff began to have frequent coughs and sometime between December 14 and December 25 he showed Nurses Altman, Moore, Crowley, and Davis, a tissue with blood stains from his coughing, in response to which they gave him ibuprofen. (*Id.* at 42.) On the same day Plaintiff showed them the tissue, he gave them a sick call slip and also verbally complained about daily chest pains, severe eye pain, daily headaches, and difficulty sleeping, and that he needed to see a doctor. (*Id.* at 43-44.) Plaintiff complained to Nurse Altman and gave him call slips on many other occasions during December 2017 and Nurse Altman failed to take any action. (*Id.* at 48-49; *see* ECF No. 13 at 92, 120 (call slip dated Dec. 23, 2017 complaining of pain in eyes, chest, headaches, fatigue, breathing problems, and heart witches and requesting to see a doctor); *id.* at 64, 123 (call slip dated December 25, 2017 indicating skin condition worsening and that hydrocortisone cream is not working).) Plaintiff alleges that he should not have been given ibuprofen—which increases blood pressure and does not help chest pains, coughing up blood, or sleep—and further that the various medical slips he submitted were not addressed. (TAC at 44.)

Plaintiff was taken on January 1, 2018 for an outside medical trip for an electrocardiogram and another medical test. (*Id.* at 51.) While Plaintiff was waiting to leave, around 7 or 8 A.M., he told the deputy officer with him that he needed his diabetes and hypertension medication and that officer called Nurse Gandulla. (*Id.* at 9, 50.) Plaintiff was told that he would get his medication

when he returned. (*Id.* at 51.) When Plaintiff returned to Sullivan County Jail around 10 A.M., he again asked for his medication and was told that a nurse would provide it to him when he returned to his unit. (*Id.* at 51-52.) Back in his unit, Plaintiff informed a deputy that because he went on an outside trip, he did not get his medication that morning and that he needed the medication because he was having chest pains. (*Id.* at 52.) The deputy called Nurse Gandulla and indicated to Plaintiff that he had logged the call in the logbook. (*Id.*)

Around 11 A.M., Plaintiff's blood pressure felt elevated, his chest was hurting, and his blood felt hot, so two other inmates called the deputy over and the deputy again called Nurse Gandulla. (*Id.* at 52-53.) Nurse Gandulla did not come to Plaintiff's unit—which is forty seconds away from the medical unit—or have Plaintiff brought to the medical unit to give Plaintiff medication or check his blood pressure. (*Id.* at 53.) Plaintiff avers that without his medication he felt like he was "gonna have a heart attack and die." (*Ed.* at 54-55.) Plaintiff received his medication at 3 P.M. (ECF No. 13 at 103-106, 117-19.) Plaintiff alleges that even though Nurse Gandulla knew that Plaintiff was diagnosed with hypertension and type 2 diabetes while at Sullivan County Jail, and received numerous requests from Plaintiff through various deputies, Nurse Gandulla "intentionally" delayed his diabetes and hypertension medication and blood pressure check. (TAC at 50, 53, 55.) An informal grievance was prepared regarding Nurse Gandulla's delayed provision of Plaintiff's medication and blood pressure check. (*Id.* at 56; ECF No. 13 at 60, 121.)

After Plaintiff was transferred to a different facility in March 2018, he received Corporal Calangelo's denial of the grievance regarding Nurse Gandulla's failure to provide his medication or check his blood pressure on January 1, 2018. (TAC at 56-57.) On the denial, Nurse Practitioner Saur indicated that Plaintiff received his medication and blood pressure check during the morning

7

shift prior to the outside visit even though Plaintiff did not receive his medication or blood pressure check that morning, as indicated in the grievances written by the deputy and Plaintiff. (*Id.* at 56-57.)

In December and January, Plaintiff was treated for skin rashes and boils on multiple occasions and given three different creams. (*Id.* at 32, 35.) First, in December 2017, Plaintiff brought up his skin complaints with Nurse Davis, who ignored Plaintiff's complaints and did not examine or treat him. (*Id.* at 35.) Then, Plaintiff complained to Nurse Altman who did not examine Plaintiff but gave him either hydrocortisone cream or A&D ointment, which did not help Plaintiff's skin boils. (*Id.* at 11, 35.) Plaintiff also complained about his skin rashes and boils to Nurse Practitioner Saur, mentioning that the boils are constantly bleeding and getting puss on his boxers and jumpsuit, but Nurse Practitioner Saur did not examine him and just gave him hydrocortisone or A&D ointment. (*Id.* at 58.) At some point in January 2018, Plaintiff submitted an additional sick call slip and again saw Nurse Practitioner Saur who finally examined the boils on his legs and thighs and prescribed a different cream. (*Id.*)

Plaintiff alleges that Nurse Altman and other medical staff also saw and smelled the conditions of the Unit during medical rounds and "verbally acknowledged" the conditions. (*Id.* at 43, 64.) Plaintiff further alleges that when he complained that he was having difficulty breathing in the Unit, Nurses Altman and Moore told him to report it to the officers. (*Id.* at 30.)

C.     *Summary of Complaints*

1.     Informal Grievances and Sick Call Slips

On December 23, 2017, Plaintiff submitted a sick call slip regarding pain in his eyes and chest, intermittent headaches, fatigue, difficulty breathing, and heart twitches, and requesting to see a doctor. (ECF No 13 at 64, 120.)

On December 22, 2017, an informal grievance was filed, which Plaintiff and a deputy signed, indicating that rust was coming out of Plaintiff's sink; a corporal indicated that the grievance was not accepted because when he inspected the sink, the water was running clear, but the corporal nonetheless noted the issue in the maintenance logbook. (*Id.* at 62, 91, 127.)

On December 23, 2017, Plaintiff submitted a sick call slip indicating that the cream he had been given was not working and his skin conditions were worsening. (*Id.* at 92.) On December 25, 2017, Plaintiff submitted a sick call slip indicating that since December 14 he had been complaining of mold in the unit and of worsening skin conditions that the ointment he had been given was not helping. (*Id.* at 123.)

On January 1, 2018, an informal grievance was signed by both Plaintiff and an officer regarding Plaintiff's failure to receive his medication in the morning despite complaints of chest pain that resulted in two calls to Nurse Gandulla. The supervisor who reviewed the grievance that day indicates that Plaintiff's complaint was that he did not get his medication until 3 P.M. even though he is supposed to get it in the morning and that Nurse Moore saw Plaintiff at 8:52 P.M. to check his blood pressure and noting that medical indicated they tried to see Plaintiff earlier in the day but he was "indispose." (*Id.* at 60, 94, 106, 121.)

On January 3, 2018, an informal grievance was completed, which Plaintiff, a deputy, and a sergeant signed, noting the delay Plaintiff experienced in seeing an eye doctor and that medical indicated to the sergeant that Plaintiff is scheduled for an eye appointment. (*Id.* at 125.)

2.   Grievance No. 17-340

On December 21, 2017, Plaintiff drafted a letter outlining his grievances: (1) inadequate medical care, (2) unsanitary conditions in his unit, and (3) being forced to use informal grievance process instead of filling out his own grievance. (*Id.* at 42-25.) On December 23, 2017, Plaintiff submitted a Grievance No. 17-340, attaching the letter from December 21, 2017. (*Id.* at 41-45.)

On December 26, 2017, Corporal Gabriel wrote a memorandum responding to the grievance and noting that (1) Plaintiff was seen in the medical unit on December 26, 2017 for complaints of headaches, runny nose, coughing up blood, chest pain, dizziness, and tiredness and as fully evaluated by "NP," who evaluated all of his concerns, completed a health history, ordered lab work, and gave Plaintiff medication and that NP indicated to Plaintiff that some of his medical concerns might be the result of change in weight and blood pressure; (2) regarding conditions in the Unit, on the day of the initial complaint, an officer checked the water and it was clear, the facility has full-time maintenance staff that routinely inspect and address issues, including ventilation system issues, and cleaning supplies are provided to inmates to maintain the cleanliness of their own units, all of which Corporal Gabriel confirmed by conducting his own inspection; (3) while an informal process through which staff fill out requests is available and encouraged to resolve issues without the formal grievance process, Plaintiff can always submit a grievance form. (*Id.* at 46-48, 53-54.)

On January 2, 2018, Plaintiff appealed Grievance No. 17-340. (*Id.* at 52.) By memorandum dated January 3, 2018, Lieutenant Bini denied the appeal, noting that Plaintiff has been seen by medical personnel sixteen times since November 25, 2017 and largely restating Corporal Gabriel's findings regarding the facility conditions and grievance process. (*Id.* at 51; *see id.* at 49-50 (chart listing medical visits between November 25, 2017 and January 3, 2018).) By memorandum dated January 4, 2018, Corporal Calangelo informed Plaintiff that Grievance No. 17-340 was forwarded to the Review Council. (*Id.* at 38.)

### 3.   Grievance No. 17-338

Informal grievance with Grievance No. 17-338 was completed on December 25, 2017 indicating that Plaintiff complained about rust in the showerhead, signed by Plaintiff and indicated as "not accepted" by an officer and corporal. (*Id.* at 63, 93, 124.)

Plaintiff attempted to submit Grievance No. 17-338 on December 27, 2017 again alleging delayed and inadequate medical treatment, and unsanitary living conditions. (*Id.* at 79-90.) By memorandum dated January 2, 2018, Corporal Calangelo indicated that Grievance No. 17-338 was improperly filled out on December 27, 2017 and that if Plaintiff wishes to appeal Grievance No. 17-340, he must appeal to the chief administrator. (*Id.* at 78.) Plaintiff re-submitted Grievance No. 17-338 on January 2, 2018. (*Id.* at 76.) By memorandum dated January 4, 2018, Corporal Calangelo indicated that Plaintiff's complaints were already presented in Grievance No. 17-340 and addressed by Lieutenant Bini and added that Plaintiff admitted on December 25, 2015 to tampering with a non-adjustable shower nozzle, which caused it to break free, that maintenance request was noted on December 25, 2017 and the nozzle was replaced by maintenance on January 3, 2017. (*Id.* at 75.)

4.   Grievance No. 18-027

Plaintiff submitted Grievance No. 18-027 on January 2, 2018 complaining that he had not received his medication the morning of January 1, 2018 and requesting to appeal to Albany regarding an improper grievance program and conflict with staff. (ECF No. 13 at 109-12.) Corporal Calangelo returned the grievance on January 10, 2018 because the action requested had no relation to the complaint. (*Id.* at 108.) By memorandum dated January 15, 2018, Corporal Calangelo indicated that Plaintiff had not resubmitted his grievance and that the grievance was already answered and that Plaintiff could appeal. (*Id.* at 107.)

5.   Grievance No. 18-033

On January 2, 2018, Plaintiff submitted Grievance No. 18-033 complaining that on January 1, 2018, Nurse Gandulla did not give him his morning medication until 3 P.M. or check his blood pressure despite complaints of chest pain and calls to the medical unit, attaching an informal grievance form signed by Plaintiff and deputy on January 1, 2018. (*Id.* at 103-106, 117-19.) By

11

memorandum dated January 21, 2018, Corporal Calangelo denied Grievance No. 18-033 indicating that Nurse Gandulla twice attempted to see Plaintiff after he returned from the outside trip on January 1, 2018. (*Id.* at 101.) Corporal Calangelo also noted that as of January 21, 2018, Plaintiff had filed five separate grievances, which had been answered at an administrative level and forwarded to the Review Council. (*Id.*) Plaintiff appealed this denial. (*Id.* at 102, 114.) By memorandum dated January 23, 2018, Lieutenant Bini responded, confirming that Plaintiff's appeals to him have been responded to and that any medical complaints are "accepted and this administration has taken the necessary corrective action to ensure this doesn't happen again." (*Id.* at 115.) By memorandum dated January 26, 2018, Corporal Calangelo advised Plaintiff that his grievance was forwarded to the Review Council. (*Id.* at 113.)

### 6.   Grievance Process

Plaintiff alleges that Corporal Calangelo intentionally failed to process many of his grievances, and when she did review and deny them, failed to attach appeal forms to denials. (TAC at 10, 21.) He further alleges that Corporals Gabriel and Calangelo also failed inspect the facility and that Corporals Gabriel and Calangelo helped each other to cover up the inadequacy of the living conditions and grievance program by responding to and denying many of Plaintiff's grievances. (*Id.* at 11, 21-22.) Plaintiff alleges that Lieutenant Bini is also responsible because Plaintiff appealed the grievance denials to Lieutenant Bini, who also denied them. (*Id.* at 11.)

## II.   Procedural History

Blanch filed this action on January 26, 2018. (ECF No. 2.) The Court granted Plaintiff's request to proceed without prepayment of fees (ECF No. 4) and issued an Order of Service directing the Clerk of Court and the U.S. Marshals service to effect service on Plaintiff's behalf (ECF No. 6). On May 2, 2018, after notifying the Court that Plaintiff had been transferred to a different facility, Plaintiff filed his First Amended Complaint (ECF No. 13), in response to which

the Court issued a Supplemental Order of Service (ECF No. 28). On June 21, 2018, Plaintiff filed

the Second Amended Complaint (ECF No. 26), which the Court dismissed without prejudice (ECF

No. 29). The Court subsequently restored the Second Amended Complaint. (ECF No. 38.)

On September 3, 2019, the Court issued an Order to Show Cause why this action should

not be dismissed without prejudice for want of prosecution. (ECF No. 60.) Plaintiff responded

(ECF No. 62) and the Court issued an order deeming the Order to Show Cause moot, granting

Plaintiff leave to file a Third Amended Complaint, and setting a schedule for the Defendants to

file their respective motions to dismiss (ECF No. 67).

Plaintiff filed the Third Amended Complaint on January 6, 2020, which seeks $150,000 in

compensatory damages, $350,000 in declaratory relief, $200,000 in punitive damages, and court

orders (1) "to maintain living conditions," (2) for "better medical department staff," (3) for a full

health inspection of modular units, (4) for labs and/or bloodwork to identify and treat "known"

and unknown conditions, (5) to test the water, and (6) to comply with the minimum standards

governing county jails. (ECF No. 70.) The Defendants' respective motions to dismiss are now

before the Court.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the

complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)). The Court must take all material factual allegations as true

and draw reasonable inferences in the non-moving party's favor, but the Court is "not bound to

accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory

statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* (quoting *Twombly*,

550 U.S. at 555). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. That said, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556 (internal quotation marks omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint, including documents that a pro se litigant attaches to his opposition papers, statements by the plaintiff submitted in response to a defendant's request for a pre-motion conference, and documents that the plaintiff either possessed or knew about and upon which he or she relied in bringing the suit." *Gayot v. Perez*, No. 16-CV-8871 (KMK), 2018 WL 6725331, at *4 (S.D.N.Y. Dec. 21, 2018) (internal quotation marks, alterations, and citations omitted). In other words, the Court may "consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013).

A court must read a *pro se* complaint liberally, interpreting it "to raise the strongest arguments that [it] suggest[s]." *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010). A motion to dismiss a *pro se* complaint should only be granted if the complaint raises no plausible right to relief under any set of facts the plaintiff could plausibly prove. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A liberal construction of a *pro se* plaintiff's complaint and submissions is

especially important if it includes an allegation of civil rights violations. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Nonetheless, a *pro se* plaintiff's complaint must plausibly set out entitlement to relief with sufficient factual allegations. *Jackson*, 709 F. Supp. 2d at 224. A court liberally construing a *pro se* complaint is not required to re-write it or ignore the lack of an element essential to an entitlement to relief. *Geldzahler v. N.Y. Medical Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

## DISCUSSION

Plaintiff's Third Amended Complaint alleges that (1) Sheriff Schiff, Undersheriff Chaboty, Aministrator Smith, and Joe D.PW. provided and were deliberately indifferent to inadequate and unsafe living conditions; (2) these four Defendants along with Corporals Calangelo and Gabriel, Lieutenant Bini, Nurses Altman, Moore, Crawley, and Davis were deliberately indifferent to the risk of harm Plaintiff faced by living in such conditions; (3) Nurses Altman and Gandulla provided Plaintiff inadequate medical treatment and/or denied him adequate care; (4) Nurse Moore ignored sick call slips and denied medical care; (5) Doctor Good deprived Plaintiff of medical care by never evaluating him; (6) Nurse Practitioner Saur initially failed to examine Plaintiff and provided inadequate care, thereby delaying his recovery; and (7) Nurses Crawley and Davis provided inadequate medical care.

In sum and substance, Defendants aver that Plaintiff has failed to state a claim (1) for unconstitutional conditions of confinement where (a) the alleged conditions were not objectively severe, and (b) Plaintiff has not alleged that the Conditions Defendants or the Supervisory Defendants were personally and deliberately indifferent to the conditions; (2) for constitutionally inadequate medical care including where (a) Plaintiff received appropriate medical treatment for all of his ailments, (b) Dr. Good cannot be held liable merely because of his supervisory position, and (c) Nurse Crawley was never served; (3) for inadequate grievance procedure; (4) against any

of the Defendants in their official capacities or for conspiracy; or (5) under state law where Plaintiff

fails to allege he sent the requisite notice of claim, and even if Plaintiff has stated any viable claims,

(6) Defendants are entitled to qualified immunity.

The Court addresses the sufficiency of Plaintiff's claims in turn.

## I.        Section 1983 Claims

Plaintiff alleges that Defendants violated his constitutional rights by being deliberately

indifferent to unconstitutional living conditions and denying or providing inadequate medical

care.[3]

### A.        Legal Framework

Section 1983 provides, in relevant part: "[e]very person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any

citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983

"is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere

conferred by those parts of the United States Constitution and federal statutes that it describes."

*Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida*, 375 F.3d

206, 225 (2d Cir. 2004). To state a claim under Section 1983, a plaintiff must allege "(1) the

challenged conduct was attributable to a person who was acting under color of state law and (2) the

conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of*

---

[3] To the extent Plaintiff claims that any inadequacy of the grievance program is unconstitutional, an incarcerated individual does not have a Constitutional right to a grievance procedure, *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003), and, therefore, inmate grievance programs created by state law, or the failure the follow such procedures, cannot be the basis for a Section 1983 claim, *e.g. Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) ("a state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause"). If Plaintiff wishes to challenge the grievance process, he must do so through a statutory claim under New York law.

*New York*, No. 09 Civ. 5446, 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *accord Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

### 1.   Personal Involvement

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (holding that "there is no special rule for supervisory liability). Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution'" (quoting *Iqbal*, 556 U.S. at 676)).

### 2.   Deliberate Indifference

The Constitution requires that prison officials "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" *Id.* at 832 (internal quotation marks and citation omitted). A post-conviction-prisoner's deliberate indifference claim is analyzed under the Eighth Amendment while the same claim raised by a pretrial detainee is analyzed under the Due Process Clause of the Fourteenth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

Plaintiff was detained following a parole violation. (TAC at 25, 38.) The Second Circuit has not definitively addressed whether individuals detained for parole violations fall under the Eighth or Fourteenth Amendment. *Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020). However, multiple courts within this circuit have held that that parolees fall under the "Due Process Clause of the Fourteenth Amendment." *Griffith v. AMKC Rikers Island*, No. 1:21-CV-0386 (LLS), 2021

WL 848103, at *3 (S.D.N.Y. Mar. 4, 2021) (alteration omitted) (collecting cases). Accordingly, the Court applies the Fourteenth Amendment standard here.[4]

The two-pronged "deliberate indifference" standard applies to all claims under the Fourteenth Amendment, including those challenging conditions of confinement and medical needs. *Darnell v. Pineiro*, 849 F.3d 17, 33 n.9 (2d Cir. 2017). The objective prong requires a "sufficiently serious" deprivation, meaning that the conditions alleged, "either alone or in combination, pose an unreasonable risk of serious damage to [the plaintiff's] health." *Id.* at 30, 32. The *mens rea* prong is defined objectively: a plaintiff must allege that "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [plaintiff] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. Negligence alone does not satisfy this standard.[5] *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

---

[4] There is significant confusion in the parties' papers regarding which standard applies. Plaintiff indicates that his prisoner status is "convicted and sentenced prisoner" (TAC at 3) and cites to the Eighth Amendment (*passim.*), but his allegations clarify that he was residing in the Unit after he violated parole (TAC at 25, 38).

The Conditions and Medical Defendants mistakenly aver that the same standard applies to deliberate indifference claims under both the Eighth and Fourteenth Amendments (Conditions Mem. at 11; Medical Mem. at 9 n.2). While the Supervisory Defendants correctly note that the Eighth and Fourteenth Amendment standards are distinct under following *Kingsley v. Hendrickson*—which held that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one," 576 U.S. 389, 396 (2015)—and *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017), their papers assume that the Eighth Amendment applies (Supervisory Mem. at 5-6), even though their statement of facts seems to acknowledge that Plaintiff was in the Unit as a parolee (*id.* at 2 ("Plaintiff was arrested and remanded").) As explained above, because Plaintiff was detained in the Unit as a parolee, the Fourteenth Amendment applies.

[5] While the objective prong of the Eighth and Fourteenth Amendment analysis is the same, *Darnell*, 849 F.3d at 30, 32, 35, the *mens rea* prong under the Eighth Amendment requires that the defendant official acted or failed to act "while *actually aware* of a substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280 (emphasis added). In other words, while a prisoner stating a claim under the Eighth Amendment must allege that individual officers knew of and disregarded risks, detainees proceeding under the Fourteenth Amendment need only allege that officials should have known of such risks.

B.      Conditions of Confinement

Plaintiff alleges that Defendants subjected him to unsafe air and water in the Unit. To state a claim for exposure to environmental contaminants, a plaintiff must allege "that he himself is being exposed to unreasonably high levels" of the element in question. *Helling v. McKinney,* 509 U.S. 25, 35 (1993). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* at 29 (internal quotation marks omitted). While numerous courts have held that detainees have a constitutional right to adequate ventilation and water, *e.g. Board v. Farnham*, 394 F.3d 469, 487 (7th Cir. 2005) ("the right to adequate and healthy ventilation was, and has been for some time, a clearly established constitutional right"); *Bellezza v. Fischer*, No. 05 Civ. 98(DLC), 2006 WL 3019760, at *4 (S.D.N.Y. Oct. 24, 2006) (noting that provision of water that "could not be used for drinking or bathing without causing extreme discomfort . . . could be deemed to be 'objectively sufficiently serious' to raise the prospect of a constitutional violation,"), unpleasant or unsanitary conditions only rise to the level of a constitutional violation if they amount to an "objectively, sufficiently serious . . . denial of the minimal civilized measure of life's necessities." *Willey v. Kirkpatrick*, 801 F.3d 41, 66 (2d Cir. 2015). As to *mens rea*, a plaintiff "can establish a due process claim for inhumane conditions of confinement either by [alleging] an official's deliberate indifference to those conditions, or by [alleging] that that those conditions are punitive." *Darnell*, 849 F.3d at 34 n.12

Plaintiff alleges three separate issues with the conditions in the Unit: (1) poor ventilation and mold, both of which persisted throughout his time in the Unit but became worse as the weather got colder and the heat was turned up; (2) inadequate drinking water; and (3) bathing water that caused painful skin conditions. Even assuming that one or more of these three conditions is sufficiently serious to meet the objective prong, Plaintiff has failed to allege that any of the

Defendants acted with the requisite recklessness or intent necessary to state a deliberate indifference claim against them where, at most, Plaintiff alleges negligence.

Plaintiff's allegation that Sheriff Schiff, Undersheriff Chaboty, Administrator Smith, and Joe D.P.W. hold positions that make them responsible for the conditions of the Unit are insufficient. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) ("a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority"). The allegations that Sheriff Schiff, Undersheriff Chaboty, Administrator Smith (because they were named in a prior lawsuit regarding conditions in the Unit); Joe D.PW. (who must have seen and smelled the mold and poor ventilation at least when he repaired the shower nozzle); Nurses Moore, Altman and the other Medical Defendants (who Plaintiff told that his ailments were from the conditions in the Unit and who saw those conditions and commented on them during their rounds); and Lieutenant Bini and Corporals Gabriel and Calangelo (who responded to Plaintiff's grievances and appeals thereof)[6] were "on notice" of the conditions and "took no action" are similarly inadequate. *Hamilton v. Westchester Cnty.*, No. 18-CV-8361 (NSR), 2020 WL 917214, at *7 (S.D.N.Y. Feb. 25, 2020) (dismissing deliberate indifference claim regarding, *inter alia*, lack of ventilation and rusty water dripping in plaintiff's cell, because plaintiff's cursory claim that certain defendants were "on notice" of, *inter alia*, the poor ventilation in his housing unit, but "took no action" did not satisfy the *mens rea* requirement of the Fourteenth Amendment); *see also Vail v. City of New York*, No. 18CIV11822VECSLC, 2020 WL 3548074, at *8 (S.D.N.Y. May 15, 2020), (holding that plaintiff who alleged failure to repair toilet in cell, which resulted in insect bites that might leave permanent scar, had not alleged the requisite

---

[6] To the extent Plaintiff alleges any defect in the grievance process or that his grievances were mishandled, "[a] prisoner has no constitutional right to a prison grievance procedure or to have his grievances investigated." *White v. Westchester Cnty.*, No. 18 CV 990 (VB), 2018 WL 6493113, at *3 (S.D.N.Y. Dec. 10, 2018).

intentional or reckless *mens rea* where "Vail does not allege that the City intentionally caused the toilet to leak; that on being told that the toilet was leaking, knew or should have known the toilet leak would cause insect bites, and then ignored such risk; knew or should have known that the toilet leak would cause any substantial harm, and then ignored that risk; or that he informed the City of the insects"), *report and recommendation adopted,* No. 18CV11822VECSLC, 2020 WL 3547736 (S.D.N.Y. June 30, 2020).

Accordingly, Plaintiff has failed to allege that any of the Defendants acted in a manner that rose above the level of negligence with respect to the creation or maintenance of the conditions in the Unit. The Court must dismiss the conditions of confinement claims.

C.    *Deliberate Indifference to Medical Needs*

Plaintiff also alleges that Defendants were deliberately indifferent to his various medical needs. The threshold question is "whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). Because "the prison official's duty is only to provide reasonable care," prison officials are liable only if they fail "'to take reasonable measures' in response to a medical condition." *Id.* at 279-80 (quoting *Farmer*, 511 U.S. at 847). The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Salahuddin*, 467 F.3d at 280. A serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.*; *see also Chance*, 143 F.3d at 702 (describing a serious medical condition as "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'" (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994))). If the allegedly offending conduct "is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. If the offending conduct is the "medical treatment given," the court considers "the severity of the temporary deprivation alleged

by the prisoner," not "the severity of the prisoner's underlying medical condition." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003). In other words, the court considers "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. Harm is considered "sufficiently serious" if it could "produce death, degeneration, or extreme pain," *Hill v. Curcione*, 657 F3d. 116, 122 (2d Cir. 2011), or "the failure to treat [the] condition could result in further significant injury or the unnecessary and wanton infliction of pain," *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The *mens rea* prong requires a plaintiff to allege that the defendant-official "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. "A delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial" constitutes only malpractice, *Harrison*, 219 F.3d at 139, and medical malpractice is insufficient to satisfy the *mens rea* prong of a deliberate indifference claim, *Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

### 1.   Skin Rashes and Boils

Plaintiff alleges that inadequate examination and treatment of his skin rashes and boils in December 2017 and January 2018 prolonged his suffering and caused "unnecessary pain." Specifically, he alleges that Nurse Davis initially failed to examine or treat him (*Id.* at 35), that on two subsequent occasions Nurse Altman and Nurse Practitioner Saur gave plaintiff creams that did not help and failed to examine him (*Id.* at 11, 35, 58), and that only after he submitted an additional sick call slip did Nurse Practitioner Saur finally examine him and provide an effective cream. (*Id.*)

In other words, Plaintiff alleges that the Medical Defendants delayed and inadequately treated his skin conditions.

Courts have routinely held that skin conditions such as acne, rashes, and sores do not constitute a sufficiently serious medical need unless they significantly limit the plaintiff's ability to function. *See, e.g., Lewal v. Wiley*, 29 F. App'x. 26, 29 (2d Cir. 2002) (holding "persistent rash" did not satisfy requirement to allege serious medical condition); *Burke v. Pillai*, No. 3:14-CV-01680-VAB, 2015 WL 1565413, at *4 (D. Conn. Apr. 8, 2015) (holding that plaintiff's allegation that "lapse in medication caused inflammation of the cysts and boils causing bleeding and leakage, exposing me to possible further infection" without any allegation that any areas were showing any signs of infection, meant that plaintiff was effectively "alleging only that the interruption resulted in common symptoms of acne," which is not a serious medical need); *Hill v. Napoli*, No. 6:09–CV–6546–MAT, 2014 WL 1322476, at *15 (W.D.N.Y. Mar. 31, 2014) ("Even assuming that Plaintiff did have eczema, it was not sufficiently serious that a failure to treat it could be expected to lead to substantial and unnecessary suffering, injury, or death."); *Melendez v. Costello*, No. 6:12–CV–6226 MAT, 2013 WL 5937052, at *7 (W.D.N.Y. Nov. 1, 2013) (holding that chronic eczema worsened by failure to prescribe effective medications did not satisfy requirement to allege serious medical need); *Samuels v. Jackson*, 97–CV–2420, 1999 WL 92617, at *1-3 (S.D.N.Y. Feb. 22, 1999) (scabies causing open sores, abrasions, and scarring did not constitute sufficiently serious medical need). Plaintiff's allegation that he was in regular discomfort and "unnecessary pain" is insufficient to state a claim because it does not allege that "the failure to treat [the] condition [resulted] in further significant injury or the *unnecessary and wanton infliction of pain*," *Harrison*, 219 F.3d at 136 (emphasis added).

Accordingly, Plaintiff has failed to state a plausible claim for deliberate indifference based on inadequate treatment for his skin conditions.

### 2.      Headache, Respiratory, & Cardiac Complaints

Plaintiff alleges that on various occasions prior to and during December 2017, Nurses Altman, Crawley, Moore, and Davis failed to act on Plaintiff's complaints or sick call slips.[7] Specifically, Plaintiff alleges that in November, Plaintiff reported daily dizziness, severe eye pain, and daily headaches on a sick call slip to either Nurse Altman or Moore, who gave him ibuprofen. (TAC at 38.) Plaintiff began to have frequent coughs and sometime between December 14 and December 25 he showed Nurses Altman, Moore, Cawley, and Davis, a tissue with blood stains from his coughing, gave them sick call slip, and verbally complained about daily chest pains, severe eye pain, daily headaches, and difficulty sleeping, in response to which they gave him ibuprofen. (*Id.* at 42-44.) Plaintiff alleges that he should not have been given ibuprofen—which increases blood pressure and does not help chest pains, coughing up blood, or sleep issues. (*Id.* at 44.) Plaintiff complained to Nurse Altman and gave him call slips on many other occasions during December 2017 and Plaintiff alleges that Nurse Altman failed to take any action. (*Id.* at 48-49.)

Multiple courts have held that the conditions Plaintiff alleges do not amount to "serious" medical needs that can be the basis for a constitutional claim. *Sledge v. Bernstein*, No. 11 CIV. 7450 PKC HBP, 2012 WL 4761582, at *5 (S.D.N.Y. Aug. 2, 2012) ("courts in this district have held that terrible and extreme headaches and swelling do not satisfy the objective component" (collecting cases)) Additionally, because Plaintiff alleges that he was provided some care,

---

[7] The Medical Defendants aver that any claims against Nurse Crawley must be dismissed because Nurse Crawley was never served. A review of the docket indicates after an unsuccessful service attempt on Nurse Crawley in September 2017 (ECF No. 52), the Court issued a Valentin Order directing the Medical Defendants to provide Nurse Crawley's address (ECF No. 53). While counsel provided the Court and Plaintiff with Nurse Crawley's last known address (ECF. No 54), no supplemental order of service was subsequently issued so Plaintiff, who is *pro se* and proceeding in forma pauperis, cannot be prejudiced by the failure to serve Nurse Crawley.

including ibuprofen, his claim sounds in adequacy of care and not outright denial and he has not alleged that inadequate treatment was "sufficiently serious" such that it resulted in "degeneration, or extreme pain." *Hill*, 657 F3d. at 122. To the extent Plaintiff alleges the provision of ibuprofen when he complained about headache and chest pains, he has not stated a claim for deliberate indifference because "mere disagreement over the proper treatment does not create a constitutional claim . . . . the fact that a prisoner might prefer a different treatment does not give rise to an [constitutional] violation." *Chance*, 143 F.3d at 703; *see also Meisel v. Westchester Cnty.*, No. 18-CV-7202 (CS), 2020 WL 3472500, at *6 (S.D.N.Y. June 25, 2020) (holding that the "allegation . . . that Plaintiff did not receive the type of treatment he wanted . . . does not give rise to a deliberate indifference claim"); *Brown v. McElroy,* 160 F.Supp.2d 699, 706 (S.D.N.Y. 2001) ("[T]he fact that a plaintiff feels that more should have been done for his condition is not a sufficient basis for a deliberate indifference claim.").

Accordingly, Plaintiff has failed to state a plausible claim for inadequate response to his various complaints and call slips prior to and including December 2017.

### 3. Delayed Administration of Medication on January 1, 2018

Plaintiff alleges that Nurse Gandulla was deliberately indifferent to his medical needs when she failed to give him his morning medication or check his blood pressure until 3 P.M. on January 1, 2018. Multiple courts have held that a several hour delay in treatment or provision of medication does not rise to the level of a constitutional violation absent an allegation of substantial harm or risk of harm because of the delay. S*ee, e.g.*, *Bilal v. White*, 494 F. App'x 143, 145-46 (2d Cir. 2012) (affirming dismissal of deliberate indifference claims where "[a]lthough epilepsy and arthritis arguably are serious underlying conditions, the record evidence . . . demonstrates a temporary delay or interruption in the provision of otherwise adequate medical treatment for those ailments lasting only a few hours . . . . [with] no evidence that Bilal's conditions worsened over

the hours of delay here" (citation omitted)); *Smith v. Carpenter*, 316 F.3d 178, 188-89 (2d Cir. 2003) (affirming trial court determination that jury could consider evidence regarding the absence of adverse medical effects from two missed HIV medication doses where the plaintiff failed to present evidence of permanent or on-going harm or an unreasonable risk of future harm due to the missed doses and defendants had proffered evidence that no such harm existed); *Youngblood v. Artus*, 2011 WL 6337774, at *7 (N.D.N.Y. Dec. 19, 2011) (granting motion to dismiss deliberate indifference claim where the defendant "failed to give [the plaintiff] a single dose of his seizure medication" and the plaintiff did not allege any resulting harm).

Plaintiff alleges that during the approximately four hours from when he returned to his Unit until he received his medication around 3 P.M. his blood pressure felt elevated, his chest was hurting, and his blood felt hot. (TAC at 52-53.) Even if his underlying conditions were serious and he suffered from temporary discomfort, without an allegation that the delayed medication resulted in serious harm or risk of harm, the hours-long delay in the provision medications does not meet the objective prong. *See, e.g. Griffith v. Hofmann*, No. 2:05 CV 126, 2008 WL 4682690, at *8 (D. Vt. Oct. 21, 2008) (dismissing deliberate indifference claim on summary judgment where plaintiff who had not received psychological medication for a few days alleged that he suffered "physical symptoms of withdrawal" but failed to adduce evidence of any long-term harm); *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007) (finding on summary judgment that unexplained several-day delay in dispensing plaintiff's hypertension medication did not give rise to constitutional violation where "there is no evidence that this delay caused any actual harm to plaintiff, or that the delay gave rise to a significant risk of serious harm").

Accordingly, Plaintiff has failed to state a plausible deliberate indifference claim against Nurse Gandulla.

4.        Failure to Screen During Intake/Delayed Testing

Plaintiff's allegation that he was inadequately screened upon arrival at Sullivan County Jail is insufficient to state a claim for constitutionally inadequate medical care. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 at 106. Even if county jails are required to screen detainees for various conditions, a plaintiff does not a have a constitutional right to any specific diagnostic rest, rather, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under [state tort law]." *Id.* at 107. Accordingly, Plaintiff has not plausibly alleged that any inadequacy in medical screening violated his constitutional rights.

5.        Glasses

Plaintiff alleges that he told Nurse Altman during his initial screening that he needed to see an eye doctor regarding glasses and that, despite subsequent complaints regarding pain in his eyes, Plaintiff was not sent to see an eye doctor until February 2018. Plaintiff alleges that the delay in seeing an eye doctor and getting glasses resulted in eye pain and headaches. However, numerous courts have held that, absent an improper motive, which Plaintiff does not allege here, delay in procuring glasses does not amount to a constitutional violation. *See, e.g.*, *Davidson v. Scully*, 155 F. Supp. 2d 77, 89 (S.D.N.Y. 2001) (finding that provision of eyeglasses with incorrect prescription that resulted in "headaches, sinus and nasal pain, blurry vision and tearing" did not satisfy objective prong because "blurry vision, headaches, and tearing are not conditions that produce degeneration or extreme pain and are not a sufficiently serious condition under the Eighth Amendment"); *see also Dunville v. Morton*, 2000 WL 1206653, at *2 (7th Cir. Aug. 22, 2000)

27

(affirming dismissal of claim based on delayed and inadequate optometry where plaintiff who had complained about eye pain and headaches due to improper eyeglass prescription waited over a year for an eye examination offered no proof of serious medical need that was not being treated or that delayed treatment had significantly harmed).

### 6. Claims against Dr. Good

To the extent Plaintiff alleges that Dr. Good provided constitutionally inadequate care because Plaintiff never saw Dr. Good, Plaintiff has failed to state a claim against him. *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (affirming dismissal of section 1983 claim against supervising physician who had never examined plaintiff and was not alleged to have had any involvement with plaintiff's treatment). Accordingly, the Court must dismiss any claims against Dr. Good.

*** 

In sum, the Court must dismiss all of Plaintiff's deliberate indifference to medical need claims for failure to allege objectively serious conditions or deprivations.

### D. *Additional Section 1983 Claims*

To the extent that Plaintiff seeks to hold the County liable (because he sued all Defendants in their official capacities as well as their individual capacities) or allege a conspiracy between any of the Defendants, such claims must fail because Plaintiff has not alleged an underlying constitutional violation. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (district court "was entirely correct" in declining to address Monell claim after finding no underlying constitutional violation); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("[A] plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of constitutional rights.").

E.     *Available Remedies*

The Third Amended Complaint seeks various forms of relief, some of which are unavailable to him or for the claims he raises. For example, Plaintiff's allegations pertain to events that occurred while he resided in the Unit at Sullivan County Jail between September 2017 and March 2018; however, Plaintiff has since been transferred out of that Unit. Plaintiff's submissions to the Court indicate that he has resided at various locations since he filed this action in January 2018 and although, he recently informed the Court that he currently resides at Sullivan County Jail, Plaintiff admits that it is not the same Unit or facility as that located at 4 Bushnell Avenue where the events giving rise to his claims occurred. (ECF No. 105; TAC at 2.) To the extent Plaintiff seeks injunctive or declaratory relief in the form of court ordered maintenance or environmental quality testing of the Unit in which the events giving rise to this action occurred, he must allege future danger "of sustaining some direct injury" because of the challenged conduct and that the threat of injury is "real and immediate," not "conjectural" or "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). The Third Amended Complaint fails to make any allegation regarding likelihood of future exposure to the conditions in Unit or the medical staff there.

## II.     State Law Claims

None of the nine causes of action in the Third Amended Complaint explicitly assert claims under state law; however, read in the light most favorable to Plaintiff, his allegations suggest that Plaintiff also claims that various Defendants violated state laws—including those setting requirements for grievance programs, provision of medical care, and recordkeeping at county jails—were negligent, or lied in or tampered with medical records. Because Plaintiff has failed to state any claims under Section 1983, there remain no claims over which the Court has original jurisdiction. The Court declines to exercise supplemental jurisdiction over any state law claims

29

Plaintiff's Third Amended Complaint may liberally be construed to present, *see* 28 U.S.C. § 1367(c)(3), and dismisses any such claims without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motions are GRANTED and Plaintiffs claims are dismissed without prejudice. Plaintiff may file a Fourth Amended Complaint consistent with this Opinion on or before April 30, 2021, should he choose to reassert his claims. Because the Fourth Amended Complaint will completely replace, not supplement, his previously-filed complaints, any facts or claims—including exhibits—that Plaintiff wishes to remain must be included in or attached to the Fourth Amended Complaint. An Amended Civil Rights Complaint form is attached to this Opinion.

If Plaintiff elects to file a Fourth Amended Complaint, Defendants shall have thirty days from the date of Plaintiff's filing to respond. If Plaintiff does not file a Fourth Amended Complaint by April 30, 2021, and he cannot show good cause to excuse such a failure, the claims dismissed without prejudice by this Order will be deemed dismissed with prejudice, and the case will be closed.

The Clerk of the Court is respectfully directed to (1) terminate the motions at ECF Nos. 83, 91, and 98; (2) mail a copy of this Opinion and Order to Plaintiff at the address listed on ECF, and (3) show service on the docket.

Dated:   March 26, 2021                                            SO ORDERED:
         White Plains, New York

                                             _____
                                                     NELSON S. ROMÁN
                                                 United States District Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

Write the full name of each plaintiff.


-against-

_____

_____

_____

_____

Write the full name of each defendant. If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

_____CV_____

(Include case number if one has been assigned)

## AMENDED
# COMPLAINT
(Prisoner)

Do you want a jury trial?
☐ Yes    ☐ No

---

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

---

Rev. 5/20/16

## I.    LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☐  Violation of my federal constitutional rights

☐  Other: _____

## II.   PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

_____

First Name                    Middle Initial              Last Name

_____

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

_____

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

_____

Current Place of Detention

_____

Institutional Address

_____

County, City                               State                  Zip Code

## III.   PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☐  Convicted and sentenced prisoner
☐  Other: _____

## IV.   DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

| First Name | Last Name | Shield # |

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |

Defendant 2:

| First Name | Last Name | Shield # |

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |

Defendant 3:

| First Name | Last Name | Shield # |

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |

Defendant 4:

| First Name | Last Name | Shield # |

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |

## V.    STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____
_____
_____
_____
_____
_____
_____
_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

_____
_____
_____
_____
_____

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

_____
_____
_____
_____
_____
_____
_____

## VII.   PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | | Plaintiff's Signature |
| --- | --- | --- |
| First Name | Middle Initial | Last Name |
| Prison Address | | |
| County, City | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing: _____